Bidi Vapor versus the U.S. Food and Drug Administration, Mr. Gotti. Good morning, your honors. May it please the court, I'll reserve four minutes for rebuttal. In February 2020, Bidi asked FDA in writing what are the requirements, the types, and the categories of comparator products that are required for a PMTA. In May 2020, FDA wrote back to Bidi and told the company point blank there are no specific requirements for comparator products. In other words, FDA left it up to Bidi to decide what comparators to use, and this is entirely consistent with similar statements that were made by FDA in guidance and other public statements both before and after that letter. But four months later, without warning, FDA did a 180 degree turn. It denied Bidi's PMTAs because they did not compare their non-tobacco flavored products to a specific comparator, namely their own tobacco flavored products. This is more than the surprise switcheroo considered by the Fifth Circuit in the Triton case where FDA acted contrary to guidance. Here, FDA specifically advised Bidi in writing that there was no comparator requirement. So as we demonstrated in our briefs, FDA's conduct raises four issues to Bidi specifically. FDA failed to give Bidi fair notice of that specific requirement. FDA's conduct was both ultra-virous as well as arbitrary and capricious, and FDA violated the APA notice and comment rulemaking procedures. So as to the first point under the fair notice doctrine, a regulated entity must, as the test goes, be able to, with ascertainable certainty, figure out what is required of it through the agency's public statements. And of course, in this case, we have a letter as well. Bidi spent 6.6 million dollars on their science and 285,000 pages in their application. In good faith, following FDA's instructions on what to include in the PMTAs, including consumer perception and attention studies, toxicological and testing, and an extensive public literature review. FDA also for years had said, for example, in the 2019 guidance, in the proposed PMTA rule, which eventually was finalized at the end of President Trump's term but was not published, and then during the 2018 and 2019 public meetings that they had with industry, that it was up to the PMTA applicant to choose the appropriate comparator and decide how to conduct the comparison testing based on the applicant's circumstances. And in Bidi's case, FDA went even further and confirmed in writing to the company that there were no requirements for comparator products. So as such, Bidi could not have reasonably discerned from any of this, and certainly not after FDA's letter. Let me ask you a few questions if you don't mind. So in the 2020 rule, didn't the FDA say that it must be able to tell when it's deciding whether to permit the marketing of a new tobacco product as appropriate for the promotion of the public health? It must be able to determine the likely health risks of the new product. Didn't it say that? Yes. And didn't it say that while the rule does not necessarily require applicants to conduct new studies for the purposes of application acceptance and filing, the FDA expects that it could not issue a marketing granted order unless an application contains data from a variety of sources, including both clinical and non-clinical investigations that give FDA comprehensive information about the product's likely health effects on the U.S. market? It did, yes. I think you mean the 2020 guidance. The 2020 guidance, yes. It did say that, but there are more specific statements in that guidance that go directly to this issue. This is all part of the same response to that comment, is it not? I think it's like 111 or comment 111. It's all in the same response to comment 111 that I think you rely on. Isn't it part of the same response? I don't have comment 111 in front of me, but yes, FDA did say that it's likely that clinical studies would not be required and we pointed that out, but then we concede that they did say that perhaps maybe it is. My point is that there are even more specific comments that go to the comparator aspect of all this. Let me ask you a couple of other questions if you don't mind. First, do you take issue with the FDA's determination that to be appropriate for the promotion of the public health, your burden was to show that the benefit to current smokers of your product in the form that your product promotes the quitting or switching primarily to ends products instead of combustible cigarettes, outweighs the likelihood of youth use of your product. Do you agree with that? FDA can take that position. Well, I'm asking if you agree with it. I know it's taken that position. It could be a relevant factor. Our point is that they cannot make it the only factor. They certainly can't. Let me back up a little bit then. Do you agree that the TCA requires the FDA to make a determination before it approves a marketing application to make a determination that the product is appropriate for promotion of the public health? Yes. Okay. Do you also agree that when it's trying to do that, it has to make a determination with respect to the overall population? Yes. Okay. Do you also agree that one of the primary reasons that Congress stated in its congressional findings of fact in support of the TCA for the TCA was the problem of the pediatric disease that smoking causes? Yes. Pediatric. I say that. Yes? Yes. You agree. Okay. So, do you take the position that if there's evidence that more youth would start using tobacco products, whether ENDS or whatever, would start using tobacco products as a result of the sale of your products, then people would primarily switch, who are current smokers, would primarily switch or quit smoking and switch to ENDS, that that is not appropriate for promotion of the public health? Do you take issue with that conclusion as showing that that is how we look at the overall population effect? And if so, why is that arbitrary and capricious? Let me make sure I understand your question. If underage consumers are using these products, that ends it. That means that this is not what I'm asking. Okay. Let me make sure I understand. No, I appreciate you're asking for clarification. What I'm asking is, if significantly more underage or youth users are starting to use the product, then people who are current adult users and smokers of combustible cigarettes are either primarily switching to ENDS products or quitting because of your product. Do you take the position that it was arbitrary and capricious for the FDA to conclude that, based on that scenario, assuming that that scenario exists, that the approval of the product would not be appropriate for the promotion of the public health? I would say that the court isn't there yet. Or yes, it was arbitrary and capricious for them to focus only on the youth aspect. Okay, but can you answer the question that I asked? I guess I'm a little confused. Our position . . . go ahead. It sounds like . . . I just want to streamline this. Yes. That's a concern I have as well. Is your only response to Judge Rosenbaum that you don't accept the premise? It could be, in this case specific, that there is evidence that enough kids are using our products that it would outweigh the benefit to the adults. The adult current users. Yes, adult users who are either reducing their cigarette . . . Right. Or quitting altogether. I will note that the data that is out there . . . If that's what the evidence shows, that would be a basis for denying the application. Is that what you're saying? It would be part of that denial. It could be part of that denial. Our position is that there's much, much more to consider for APPH, aside from just the . . . What else is there? There's everything from the health data, which shows is our products . . . The health of whom? It's the health risks. So if someone switches from cigarettes to our product, are they going to face less risk? And our data showed that it did. Okay. But the question that I asked you presumes that significantly more new users are starting . . . Well, and really there are two different issues here. One is significantly more users who are youth are starting because of the ENDS products, and the flavors in particular, than people are switching who are current combustible smokers, I guess, you know, are switching to ENDS products or are quitting. That's the first part. The second part, which is really the heart of this case, is, is there evidence . . . Is there any evidence . . . There is clear evidence that shows that there is a youth epidemic of using flavored ENDS products. Is there not? Would you agree with that? Yes, youth are using ENDS products. Is there any clear evidence that your application submitted that shows definitively that, to the same extent it shows for the youth users, that current users of combustible cigarettes are switching primarily to ENDS products or are quitting based on tobacco . . . based on non-tobacco flavored, that is like fruit flavored, mint flavored, candy flavored, etc., cotton candy, whatever, that there is some benefit that is a result of using these flavors that you don't get from using the tobacco flavored ENDS products? Yes. And what is, what is the evidence in your application that definitively shows that, that you would point to? Yes. So the public literature review has made several conclusions, and I'm going to go through a little list here, made several conclusions. First, that if, if you are a former smoker and you're using non-tobacco flavored products, you have a better chance than the tobacco flavor of not relapsing. Another example . . . Would menthol solve that problem? I don't know if it got into that detail, but it did, it did talk about . . . So you don't have any evidence on menthol versus other flavors? It may. So the term is N, it's non-menthol and tobacco. But you don't, you don't have any, there's nothing you could point to in what you submitted that says that you get that you can, you can't get that benefit from menthol, but you can get it from the candy and the fruit flavors. The thing I just cited too, I think you used the phrase NMPT, which means it includes menthol. So tobacco and menthol are not as effective as non-tobacco flavors in, in, in, or excuse me, let me, let me back up. I have two, two, two statements to cite to, and then a few more. The, the literature review said and found that appealing flavors help make, are better at making sure you do not have a relapse. And then the one with NMPT is that if you are a dual user, which is a good thing because it shows that people are moving from cigarettes to ends, shows that non-tobacco flavors are better than menthol and tobacco flavors at helping you quit. Did your literature review say, quote, there's not enough evidence from well-designed studies to determine whether e-cigarette flavors aid in smoking cessation, and the evidence regarding the role of flavored e-cigarettes in combustible tobacco smoking cessation is unclear? It did, but that's not everything it said. I just gave you two examples where they said non-tobacco flavors do help. We also cited to two out of the three longitudinal studies that were done before we submitted our application, two of those showed that non-tobacco flavors are better than tobacco flavors or doing, trying to do something else aside from vaping. And where would you cite me to in the record so I can review that? Sure. So the two, so it looks like it's in their supplement, Exhibit 11-5398, and it should be the Chen and the Russell cases, or excuse me, the Chen and the Russell longitudinal cohort studies. Thank you. Okay. And then I believe you're familiar with our citations where you will see those references to the adult dual users and then the appealing flavors and being able to quit. Thank you. Thank you. Did FDA consider your evidence? That is our point, Your Honor. They never looked at it. Our application, all they did was check for the presence or the absence of a very narrow, particular comparison study. That's it. That's all they did. And our position is this court does not need to get to evaluating what evidence is there, what is not, because we're not there yet. That is FDA's job. And it would be FDA's job on remains. What case law supports your contention that the administration should have considered your reliance interest? I think we cite to . . . I'll have to do that on rebuttal. But it's clear that the Supreme Court has numerous occasions in the last ten years cited to reliance interest as being relevant to the Arbiter and Caprice's standards. Is the answer affected by the fact that everything you relied upon was informal guidance? I don't think so, no. In fact, I think the Supreme Court has said that informal reliance interests and fair notice, you know, larger concept, apply to guidance documents. And in fact, I think the DACA case was enforcement discretion. I mean, that was an enforcement memo. And they talked about, there you go. That's the regent's case. And they were a lot . . . And that was an enforcement memo, an internal memo in some respects. Can I ask one quick question? Your problem with the FDA is that they required a study, and they told you they weren't going to require the study, right? Just a factual, just explain to me factually, what goes into a study like that? If you were to perform one, how long would that take? What do you know about performing such a study if the FDA came back and said, okay, now we're giving you fair notice, this is what we require? Yeah, it would be a substantial undertaking. It would take more than six months, probably. And it depends on which study we did. If you do a clinical study, you know, you have your control group, and then you're, you're not, or the group that's not doing what you're asking them to do. A longitudinal study is more like an epidemiological study where you're looking at populations. And that can take a while. Yeah, and so I guess follow up to that is one outcome I could foresee from ruling in your favor in this case is that the FDA says, you know what? We did mislead you, sorry. We're going to go ahead and tell you, we do need one of those studies. Would that solve the problem if they gave you some period of time to conduct one? It would solve the problem for this case, yeah. Right, okay, all right. Because, and then presumably, they would review the entire application as we thought they were going to do. Okay, let's, you've saved four minutes because you were on our time. Okay, thank you. Stephens. Good morning, and may it please the court. I'm Kimberly Stephens for the government. I think the conversation that we've just been having about the risk and benefits of these products really goes to the heart of the issue. The Family Smoking Prevention and Tobacco Control Act requires the FDA to deny an application to market a new tobacco product unless the applicant shows that the marketing of that product would be appropriate for the protection of the public health, taking into account the risks and benefits of that product,  presents less risk than other products. The petitioner here manufactures a type of product that is particularly likely to attract and addict kids, specifically flavored, disposable e-cigarettes that come in flavors like fresh mango and strawberry blueberry. The petitioner attempted to show that its products were appropriate for the protection of the public health despite the substantial risk to kids by submitting a literature review on e-cigarettes generally and point-in-time surveys that ask respondents questions regarding their e-cigarette use and preferences. The FDA reviewed this application and found that it lacked sufficiently strong evidence of a public health benefit in terms of helping smokers quit to offset the substantial risk to kids. FDA thus denied the application. Now, one issue I've talked about that I think is particularly critical here is this risk to kids. So I'd like to elaborate on the nature of that concern. And the first is the risk that these products are going to addict a new generation of kids to nicotine products. The evidence shows that use of tobacco products is almost always initiated during adolescence when the developing brain is most vulnerable to nicotine. I've got kids. I got it. The question I have is what about the argument from your friend on the other side of the case that, look, this is just a problem where the FDA told us we didn't have to provide a kind of study and then they denied our application because we did what they told us that we could do? Without considering the evidence that we actually submitted. Yeah, why not just have a do-over, I guess? I mean, that seems like what they're arguing for is they're not saying you have to approve it. They're just saying you need to apply the standard that you told them that you were going to apply. I think here we do have consistent statements regarding the standard, beginning with the 2019 guidance, which talked about the applicable standard and said that whether a product was appropriate for the protection of the public health would be evaluated according to these risks and benefits. In the 2019 guidance, FDA also stressed the comparative nature of this analysis. On page 13, they talked about the importance of an applicant comparing its product to other products in the same category and subcategory. And they went on to say that this would be an important part of the evaluation of the product's health impact. And indeed, this is just the type of evidence the FDA looked for in the decisional memorandum. The 2019 guidance was also consistent with the decisional memorandum with respect to the type of evidence that might be required. Both talked about how evidence of this benefit would need to be shown over time, but that these studies did not necessarily have to be long-term. In the 2019 guidance, for example, it talks about the importance of looking at trends and how consumers use these products over time. And it also talked about how long-term studies could be useful, but that applicants could also reasonably extrapolate from studies of a shorter duration. And FDA made exactly the same point in the decisional memorandum, where it talked about how the benefit in question here, which is smoking cessation, is a behavior change that occurs over time. And so studies necessarily need to evaluate it over time. And FDA explained in the decisional memorandum that this could take the form of a long-term study, but that studies of a shorter duration could also be adequate. Yeah, could you explain that to me? This is just kind of a fact question I'm trying to figure out in the case. So, you know, the FDA is saying, look, here's our standard. You could do it through this kind of study, or there's some other evidence. What is the category of other evidence that could conceivably satisfy the FDA standard? Right. So, you know, FDA has to weigh the risks and balances, and it found that given this really substantial risk to kids, it would require robust and reliable evidence of a countervailing to adults beyond that which could be had from a less risky tobacco-flavored product. And FDA has explained that this could be randomized controlled trials, it could be longitudinal studies, or it could be any other evidence that's sufficiently robust and reliable to look at this behavior change over time. Yeah, so what would that other evidence be? I mean, give me a category of evidence. So in the 2019 guidance, FDA lists a variety of types of studies, including, for example, I think on page 47, talking about using historical data to compare the impact of your product. But the petitioners here haven't come forward with anything, you know, that resembles this. Again, what we have here is a literature review that comes to the same conclusion as the FDA. As your honor pointed out, they conclude that there aren't enough well-designed studies to assess whether there's any relationship regarding flavored e-cigarette use and smoking cessation. And they have these point-in-time surveys that ask respondents questions such as, why do you use e-cigarettes? And do you prefer flavors? So these aren't going to yield the kind of robust evidence of an actual impact on adult smoking cessation. Your friend on the other side says that Exhibit 11 at 5398, which is the Chen and Russell longitudinal studies, show that there is a definitive benefit of using non-methyl and non-tobacco flavors, but other flavors such as fruit, mint, et cetera, to current smokers of combustible cigarettes in switching to ENDS primarily or in quitting. Have you reviewed that? And do you agree with that? So FDA reviewed all of the scientific literature regarding, that looked at the relationship between the use of flavored e-cigarettes and smoking cessation. And what it found is that this evidence is mixed. And in fact, the petitioner's literature review came to the same conclusion, that there aren't enough well-designed studies to come to a conclusion about any relationship between flavored e-cigarettes and smoking cessation. The existence of scattered studies that may point one way or the other don't undermine the mixed nature of that evidence overall. Let me ask you something else because this isn't entirely clear to me. I know that FDA has been approving ENDS applications for tobacco flavors, right? Is that right? Yes. Okay. Has it also been approving ENDS applications for menthol flavors? FDA has said that menthol flavored products present unique considerations. And so they're going to be considered separately. To the best of my knowledge, I just don't know if they've approved a menthol flavored product or not. Are they, do you consider them in the same group as other flavored ENDS products other than tobacco? That is, do you consider them in the same group with, for example, how you've treated mint flavor and candy flavor and fruit flavor? No, candy and fruit flavors and mint would be in one category. And as FDA has said, menthol presents these unique considerations and is handled separately. Thank you for the clarification. So I think a moment ago, and I know you all did a re-review of parts of the PMTAs that were submitted. But I think a moment ago, you said that the FDA actually did review everything that was submitted. Did I misunderstand that? The FDA reviewed the petitioner's application. And in light of this really substantial risk to kids, it looked for robust and reliable evidence of a benefit to adults beyond that, which could be had from a less risky tobacco flavored product. And so in order to look for robust and substantial evidence, what does that mean exactly? How did you do that? Did you review the materials that were submitted? I know that the agency reviewed the application to look for the existence of this kind of evidence. And having found that the petitioner didn't meet its statutory burden, it denied the application. So I guess I'm just trying to figure out what you mean by that. So you said that you reviewed it for evidence of, or you reviewed it for substantial and reliable evidence. In reviewing it for substantial and reliable evidence, does that mean that you looked at each of the studies that was submitted to see whether they qualified as substantial and reliable evidence? Or is there some other way that you reviewed it to see if it was substantial and reliable evidence? Or did you not review it to see if it was substantial and reliable evidence? No, FDA did review the application to look for this substantial and reliable evidence. As petitioners point out in their briefs, they submitted 285,000 pages in their application. And much of this goes to things like the battery certification and the shelf life stability and things that were not going to impact FDA's analysis of the risks and benefits. I see. So, for example, the composition of exactly how it's made up doesn't necessarily bear on whether or not, if it's fruit flavored, if it's a fruit flavored ends product, whether it would be more likely to cause youths, I guess youth smoking or youth end use, more than it would be likely to cause switching among current users of combustible cigarettes in your view. So if the applicant had met this statutory burden, it would of course need to evaluate things like shelf life stability and quality control. But in the face of this very central deficiency,  to get into the details of those kinds of things. Has the administration granted market authorization to any tobacco company that did not provide long term studies about the comparative efficacy of flavored products versus tobacco flavored products for helping with adult smoking cessation? The FDA hasn't approved any marketing applications for flavored e-cigarettes, but some applications have advanced to further scientific review. One example that comes to mind does involve a company that conducted a randomized controlled trial and FDA is reviewing that evidence. Do you have anything else you want to tell us, Ms. Stephens? I think we covered it. Thank you. Okay. Mr. Gotting? Just a couple of things. First, the MDO and the checklist make absolutely clear the FDA did not do anything but review our application for the presence or absence of a study. Can I ask you a question about that though? I mean, your friend on the other side has said that we look to see whether there was any evidence of robust and reliable studies. And for example, if there's information about the contents of what the ingredients are in the product, that's not going to tell us anything about whether or not more kids are likely to start using it than users of combustible smoke or combustible cigarettes are likely to switch or quit. Why is that? What is arbitrary and capricious about that? Why is that wrong? They did not justify why relying completely on the youth issue wins the day. They spent two sentences on our public literature review. Let me ask you something. Yes. Considering that you agree that the primary purpose of TCA or one of the primary purposes of TCA is to stop the pediatric epidemic of smoking, and that the TCA requires them to deny an application that is not appropriate for the promotion of the public health, and that there is significant evidence, which you agree exists, that the use of flavored ends products promotes significantly the youth use of those products. I don't agree that's the case with the bidisecs. Okay. Why not? In their TPL, they cite to the 2020 NYTS study. That's their own study. They conduct every year an annual study. They cite to it in the TPL. They rely on it to talk about youth. Underage consumers were asked, which ones have you used? Less than 0.1% of the kids identified bidisecs. 26% identified... Didn't 93% of youths who were asked about their first use of tobacco products say that they started with a flavored product? Isn't that right? Do I have that wrong? That's what their position is, yeah. Okay. Is there some reason to believe that bidis version of the flavored product is different enough from other flavored products that we would not expect to see the same result or a similar result? And if there is, where in the record can I find that? Yes, because we have such an aggressive access and marketing plan, which they did not look at. And they admit that in the footnote. Does your marketing plan have anything different than the several different parts of the plan that are identified in the various guidances and the final rule that the FDA has found did not take care of the problem so that they had to move on to enforcement actions against products themselves because the marketing was not enough? Yes, because we took all of our products offline. Okay, but weren't there still problems with brick and mortar institutions selling products? There are. Even beyond that? There are, but remember, as FDA, I'm using their words, case by case, individual application review, which they did not do. That's our position. Our marketing and access restrictions are working. Well, that's what I'm asking. And NITS shows that. Where is the evidence that you did something different that hasn't been done previously? We took our products offline. That's a significant step. That literally cuts off an entire avenue to these products. And now you can only get these products in a face-to-face transaction, either in a brick and mortar store and an ID check, and now we have 21+, which just came into effect a little over a year ago, or through just one home delivery service, which checks against government ID databases and requires an adult signature on delivery. They have not cited any evidence that kids are using biddy sticks in significant amounts. And I just cited the evidence that they're not. And your contention is they didn't consider that? They admit they didn't consider it in that footnote in the TPO. They said, we did not look at your marketing and access restrictions. And to your point, Your Honor, they don't identify to us in the TPO, and remember, that's the administrative record, which restrictions they were talking about, which PMTAs they were talking about, and how it did compare to us. The 2020 guidance that they refer to, that's all post hoc rationalization. That's that violates Chenery. That's what they need to do on remand. They did not do that in the TPO or the MDO. Thank you. Okay, thank you. We'll go to the second case.